IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MAGEN MOORE, | ) | CASE NO. 5:24-CV-01175-JPC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | JUDGE J. PHILIP CALABRESE |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | MAGISTRATE JUDGE |
| ADMINISTRATION, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Magen Moore ("Plaintiff" or "Moore"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

On March 29, 2022, Moore filed an application for supplemental security income and disability insurance benefits, alleging a disability onset date of October 25, 2019 and claiming she was disabled due to complex regional pain syndrome and post-concussion syndrome. (Transcript ("Tr.") 88.) The applications

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

1

were denied initially and upon reconsideration, and Moore requested a hearing before an administrative law judge ("ALJ").  (Tr. 14-32, 126, 131, 142, 149, 154.)

On April 24, 2023, an ALJ held a hearing, during which Moore, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 44-80.)  On August 2, 2023, the ALJ issued a written decision finding Moore was not disabled.  (*Id*. at 17-43.)[2]  The ALJ's decision became final on May 14, 2024, when the Appeals Council declined further review.  (*Id*. at 1-3.)

On July 11, 2024, Moore filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7, 9.) Moore asserts the following assignments of error:

(1) Did the ALJ commit reversible error by failing to properly consider the Plaintiff's subjective symptoms in accordance with the Social Security Administration's own regulations?

(2) Did the ALJ commit reversible error by relying on the Plaintiff's ability to perform part-time accommodated work in concluding that the Plaintiff could perform work that exists in significant numbers in the national economy?

(Doc. No. 7 at 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Moore was born in 1991 and was 31 years-old at the time of her administrative hearing (Tr. 50, 81), making her a "younger" person, under Social Security regulations.   *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has a high school education.  (Tr. 56, 82, 89, 99.) At the time of the hearing, she worked part-time with accommodations as a licensing bureau clerk.  (*Id*. at 49, 57-59.)

---

[2] The ALJ's decision contains some duplicate pages. (*See* Tr. 28-30.)

**B.     Relevant Medical Evidence[3]**

On October 26, 2019, Moore was rear-ended while stopped at a red light. (*Id*. at 341, 833, 1227.) She was diagnosed at the emergency department with whiplash. (*Id*. at 341.) She had worsening head and neck pain, dizziness, and balance problems. (*Id*. at 833.) The following week, her primary care physician diagnosed her with a concussion and referred her to physical therapy. (*Id*.)

On December 2, 2019, Moore was seen for vestibular testing due to imbalance. (*Id*. at 341.) She reported feeling off balance, light-headed, tired, and had a constant headache. (*Id*.) She appeared wobbly when sitting, with some jerky movements to maintain balance. (*Id*.) She denied vertigo. (*Id*.) She reported having a CT that was normal. (*Id*.) Vestibular testing was normal and she was encouraged to continue physical therapy. (*Id*.)

On January 3, 2020, Moore presented for a neuro-optometric rehabilitation evaluation. (*Id*. at 352.) She reported headaches, dizziness, and light and noise sensitivity. (*Id*.) The provider noted "very delayed cognitive processing, consistent unsteadiness and sway in seated and standing positions." (*Id*.) Moore stated that she doesn't "really do anything" when at home, uses a cart to stabilize at the grocery store, attends church after worship, was not driving, and sleeps "all the time or not at all." (*Id*. at 352-53.) The provider recommended occupational therapy once per week for ten weeks. (*Id*. at 355.)

On January 30, 2020, Moore underwent a speech-language pathology evaluation. (*Id*. at 1029.) Testing demonstrated "significant deficits in the areas of attention, delayed memory, immediate memory, and language/verbal fluency." (*Id*. at 1031.) Speech therapy was recommended. (*Id*.)

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On April 3, 2020, Moore had an MRI of her brain that revealed a "small incidental cavernous malformation." (*Id*. at 849.) The neurosurgeon did not think it was related to the concussion, or that it contributed to her symptoms. (*Id*. at 851-52.) He did not think it required further monitoring. (*Id*. at 852.)

On April 16, 2020, Moore presented for a telepsych session. (*Id*. at 842.) She reported pain in her neck, dizziness "now and then", anxiety, depressive symptoms, and that her processing speed had "gotten better" but sometimes "takes longer to say something." (*Id*. at 844-45.) She reported sexual abuse when she was 10 or 11 years old. (*Id*. at 847.) She was diagnosed with PTSD, major depressive disorder, and concussion. (*Id*. at 848.) Outpatient psychotherapy and psychiatric medication were recommended. (*Id*. at 849.)

On May 13, 2020, Moore was seen via video visit in the Outpatient Department of Physical Medicine & Rehabilitation for an eight-week follow up visit for concussion. (*Id*. at 833.) She reported taking several weeks off work following the accident and recently started back to work gradually, working six-hours per day. (*Id*.)

On July 15, 2020, Moore had a follow up telepsych session. (*Id*. at 819.) She reported her dizziness had gotten worse, she still experienced headaches but "they aren't as bad as they used to be", and that she would likely be discharged from physical therapy because she had plateaued. (*Id*. at 820.) Moore stated that she cancelled all appointments with the provider because she was too tired to see her in addition to PT and felt that work with this provider was "too hard." (*Id*.) The provider reported that Moore continued to experience symptoms of PTSD and depression. (*Id*.) The provider suspected Moore's physical symptoms had a functional component because Moore shared that her symptoms increased since she last saw the provider, which was an "emotionally challenging" session, and noted post-concussion symptoms did not increase. (*Id*.) Moore was not receptive of the idea of functional neurological disorder. (*Id*.)

4

On September 23, 2020, Moore attended a follow up physical therapy appointment. (*Id*. at 966.) She reported feeling she had improved seventy five percent since starting physical therapy and reported dizziness at a 0-2 out of 10 and pain at 0 out of 10. (*Id*.) The provider noted she continued to have an abnormal amount of postural sway. (*Id*. at 975.)

On September 30, 2020, Moore had a video follow up visit with a provider, Susan Bowman Burpee, APRN-CNP. (*Id*. at 804.) Moore reported that her depression symptoms improved, fatigue improved, dizziness was no longer constant but intermittent, her neck pain was improved, and she was doing ok at work. (*Id*. at 804-05.)

On February 5, 2021, Moore attended a video follow up visit with a Ms. Burpee. (*Id*. at 796.) She reported worsening neck pain over the past ten days, and that her arms felt sore. (*Id*. at 797.) She asked about testing for rheumatoid arthritis and fibromyalgia. (*Id*.) Moore stated work was going well and she was able to get through an eight-hour workday. (*Id*.)

On May 5, 2021, Moore had a consultation with Jonathan Goike, M.D., for neck pain. (*Id*. at 793.) The provider noted she had normal gait, full strength in her upper limbs with normal sensation, trigger points, reduced range of motion in her neck, and pain. (*Id*. at 794.) Dr. Goike recommended additional physical therapy to focus on the neck, a neck x-ray, and possible trigger point injections. (*Id*.) The neck x-ray was unremarkable. (*Id*. at 1191-92.)

On May 12, 2021, Moore presented for a follow up physical therapy appointment. (*Id*. at 365.) She reported that her vestibular function was improved but she still experienced symptoms. (*Id*.) She often walked with a sway, had a constant headache, and difficulty focusing at work. (*Id*.) She reported being able to use a computer for only thirty minutes before experiencing a headache and increased pain in her neck. (*Id*.)

5

On May 19, 2021, Moore had a psychiatric evaluation. (*Id*. at 1269.) She reported mental health problems starting about six years prior, treating with psychotherapy for a few years, and starting pharmacotherapy about a year ago. (*Id*.) She stated that her depressive and anxiety symptoms had not been managed with her current therapy. (*Id.*) On examination, Moore was anxious, depressed, guarded, had normal speech and thought process, had intact attention, insight, judgment, and cognition. (*Id*. at 1272.) Her medications were adjusted. (*Id*. at 1273.)

On May 28, 2021, Moore had a follow up physical therapy appointment. (*Id*. at 382.) She reported reduction in pain overall, with elevated soreness at her lower cervical spine in the first rib area. (*Id*.) She demonstrated improved range of motion and improved posture. (*Id*. at 383.)

On June 3, 2021, Moore presented for a follow up physical therapy appointment. (*Id*. at 386.) She reported less pain in her neck, but continued soreness at her lower cervical spine in the first rib area. (*Id*.) She again demonstrated improved range of motion and improved posture. (*Id*. at 387.)

On June 21, 2021, Moore had a follow up physical therapy appointment. (*Id*. at 398.) She complained of increased pain the past few days, with some numbness and tingling down her left arm to her left hand. (*Id*.) She reported her pain at a six out of ten, and experiencing a headache "nearly every day." (*Id*.) The provider reported that her range of motion continues to improve, but she continues to have difficulty maintaining a neutral posture. (*Id*. at 399.) Moore reported sitting at a computer at work for about ten minutes prior to increased neck pain. (*Id*.) She reported no longer have sleep disturbances. (*Id*.)

On July 7, 2021, Moore presented for a trigger point injection. (*Id*. at 789.)

On July 14, 2021, Moore had a follow up mental health appointment. (*Id*. at 1333.) Moore reported being compliant with her medications, continuing to feel depression and anxiety symptoms, and daytime fatigue. (*Id*.) She admitted to intentionally scratching herself. (*Id.*) A mental status exam revealed symptoms

of depression and anxiety, and intact insight and judgment. (*Id*. at 1335-36.) Her progress was noted as "improving". (*Id*. at 1337.)

On July 23, 2021, Moore presented for a follow up of the trigger point injections. (*Id*. at 782.) She reported "diffuse pain in the neck and down both arms" since the injection. (*Id*.) She said the pain radiates down the arm and it is worse on the right side than the left. (*Id*.) She also noted numbness and arm shaking, which she had had before. (*Id*. at 782-83.) The provider noted no signs of infection and agreed with Moore's primary care physician that she should be referred to neurology. (*Id*. at 784.)

On September 20, 2021, Moore had a follow up mental health appointment. (*Id*. at 1327.) Moore reported no depressive episodes since her last visit, her mood had "been okay", but her anxiety had "been a little high." (*Id*.) A mental status exam was unremarkable aside from depression and anxiety symptoms. (*Id*. at 1328-29.) Her progress was noted as "improving." (*Id*. at 1331.)

On September 23, 2021, Moore saw a neurologist, Dr. Galloway. (*Id*. at 780.) Moore reported bilateral upper extremity pain with new bilateral lower extremity pain. (*Id*.) The pain was not constant, but intermittent. (*Id*.) The exam revealed a functional gait with a tilt of the left hip during walking, and jitteriness of all extremities with postural or testing maneuvers. (*Id*. at 781.) A mental status examination revealed "intact orientation, impaired recall of recent and remote events, attention, fluent speech, and good use of vocabulary and knowledge of current events." (*Id*.) The neurologic exam revealed "significant functional overlay and is nonfocal." (*Id*. at 782.) The provider ordered bloodwork and neurocognitive testing. (*Id*.)

On October 27, 2021, Moore had a follow up mental health appointment. (*Id*. at 1315.) Moore reported not being compliant with her medications. (*Id*.) She stated her mood is "not good" and denied panic attacks. (*Id*.) A mental status exam was positive for symptoms of depression and anxiety, and impaired insight and judgment. (*Id*. at 1316-17.) Her progress was noted as "worsening." (*Id*. at 1318.) The provider adjusted her medications and discussed the importance of remaining medication compliant. (*Id*. at 1319.)

7

On November 22, 2021, Moore had a follow up mental health appointment. (*Id*. at 1309.) Moore reported not being compliant with her medications. (*Id*.) She stated her mood had improved since her last appointment and no panic attacks. (*Id*.) A mental status exam revealed symptoms of depression and anxiety, and impaired insight and judgment. (*Id*. at 1310-12.) Her progress was noted as "not improving". (*Id*. at 1313.)

On November 30, 2021, Moore presented for a follow up appointment with Dr. Galloway. (*Id*. at 603.) Moore reported jitteriness and sharp pain in both hands and arms. (*Id*. at 605.) Dr. Galloway noted the work up to date was unremarkable and neurocognitive testing was negative. (*Id*.) She referred Moore to rheumatology for possible fibromyalgia and ordered an EMG and nerve conduction study. (*Id*.)

On December 20, 2021, Moore had a follow up mental health appointment. (*Id*. at 1303.) She reported severe depression symptoms but "it's been better" and panic attacks during hard days. (*Id*.) She reported the ideation to pinch herself. (*Id*.) A mental status exam was unremarkable except for symptoms of depression and anxiety. (*Id*. at 1305-06.) Her medication was adjusted and her progress was noted as "improving." (*Id*. at 1307.)

On December 27, 2021, Moore presented for a follow up appointment with Dr. Galloway. (*Id*. at 597.) The testing showed no evidence of cervical radiculopathy, carpal tunnel, or ulnar neuropathy. (*Id*.) Neuropsychologic testing and neuropsychology consultation revealed significant anxiety and depression. (*Id*.)

On January 19, 2022, Moore had a follow up mental health appointment. (*Id*. at 1296.) Moore stated her mood was "better" and denied panic attacks. (*Id*.) A mental status exam revealed depression and anxiety symptoms, blocked thought process, and intact insight and judgment. (*Id*. at 1298-99.) Moore was noted as "improving." (*Id*. at 1299, 1300.)

On March 2, 2022, Moore had a follow up mental health appointment. (*Id*. at 1289.) She reported not taking medications as prescribed, having panic attacks, and engaging in self-harm. (*Id*.) A mental status exam revealed depression, anxiety, blocked thought process, and impaired insight and judgment. (*Id*. at 1290-92.) Her medications were adjusted. (*Id*. at 1293.)

On March 16, 2022, Moore presented for an EEG. (*Id*. at 772.) The results were normal. (*Id*.)

On March 31, 2022, Moore had a follow up mental health appointment. (*Id*. at 1282.) She reported her mood had been okay and her anxiety better since she had an EEG and the results were normal. (*Id*.) She stated her primary care physician told her to stop taking Wellbutrin due to a seizure. (*Id*.) A mental status exam was unremarkable except for depressive thought content and anxiety. (*Id*. at 1283-85.) Moore was noted to be "improving." (*Id*. at 1285.)

On June 1, 2022, Moore presented to physical therapy for a follow up appointment. (*Id*. at 1264.) She reported constant headache for the past two weeks and pain in the upper extremities. (*Id*.) She stated she planned to discontinue physical therapy and explore other methods of treatment. (*Id.*)

On June 6, 2022, Moore had a physical therapy evaluation with a new provider. (*Id*. at 1348.) Her diagnoses included dizziness and giddiness, impaired functional mobility and activity tolerance, balance disorder, and gait abnormality. (*Id*.) Moore reported making the appointment due to dizziness that went away after vestibular/vision therapy but returned about three months ago. (*Id*.) She stated work was going ok, she was able to stand longer, her employer allows her to sit, and she could tolerate eighteen to twenty hours per week. (*Id*. at 1349.) The provider recommended skilled physical therapy and thought there was "good rehab potential to achieve therapy goals." (*Id*. at 1352.)

On July 26, 2022, Moore presented for a consultation with a rheumatologist, Madhu Mehta, M.D. (*Id*. at 1370.) Moore complained of right arm and hand pain. (*Id*.) Dr. Mehta noted rheumatology labs from February 2022 were "essentially unremarkable." (*Id*.) An examination revealed no pain with range of motion

9

of the neck, normal muscle strength, normal coordination and gait, and no swelling, erythema, or tenderness of the right arms. (*Id*. at 1372.) Moore had multiple tender points. (*Id*.) Dr. Mehta opined myalgia/myofascial pain dysfunction appeared to be the main source of pain. (*Id*. at 1373.) Dr. Mehta found no evidence of osteoarthritis, rheumatoid arthritis, or lupus, and no physical findings of complex regional pain syndrome. (*Id*.)

On June 9, 2022, Moore had a follow up mental health appointment. (*Id*. at 1276.) Moore reported she had been medication compliant and denied severe depression and anxiety. (*Id*.) A mental status exam was unremarkable with her mood listed as "fair". (*Id*. at 1278-79.) Her progress was noted as "improving". (*Id*. at 1280.)

On August 30, 2022, Moore saw rheumatologist Kai Quin, M.D. (*Id*. at 1376.) Moore reported joint pain and stiffness in her right elbow. (*Id*. at 1376-77.) She was diagnosed with fibromyalgia and right lateral epicondylitis (tennis elbow). (*Id*. at 1376.) Dr. Quin recommended high intensity physical exertion in a graded fashion to treat fibromyalgia, and physical therapy for possible dry needling and warm compress to treat tennis elbow. (*Id*. at 1377-78.)

On September 12, 2022, Moore presented for an appointment with neurologist Dr. Staley. (*Id*. at 1516.) Moore reported that pain in her arms bothers her the most. (*Id*.) She described constant pain down her right arm and intermittent pain down her left arm. (*Id*.) She thought she was getting better at in early 2022, but now has gotten progressively worse. (*Id*.) She did not know why she was getting better and now worse. (*Id.*) She reported daily headaches. (*Id*. at 1517.) Dr. Staley discussed the possibility of stress manifesting as physical symptoms and that there is a higher instance of this if someone has a history of sexual or physical abuse. (*Id*. at 1518.) Moore walked out of the room. (*Id*.)

On September 12, 2022, Moore presented for an appointment with neurologist Linda Staley, M.D. (*Id*. at 1455.) Moore reported daily headaches and that her balance had substantially improved. (*Id*.) Dr.

10

Staley noted that Moore had seen three rheumatologists and that she was the third neurologist Moore had seen and that Moore appeared to be on the appropriate medications. (*Id*. at 1457.) Dr. Staley explained to Moore that the previous two neurologists mentioned a functional component to their neurological exams, meaning "that a person is exhibiting stress and trauma through physical means." (*Id*. at 1457.) Dr. Staley further explained that if stress or trauma is the cause of her pain, medication may not be the best treatment and that working through the trauma is the best treatment. (*Id*. at 1457.) Moore was upset and left the appointment. (*Id*.)

On September 14, 2022, Moore followed up with Dr. Staley. (*Id*. at 1512.) They discussed conversion disorder and Moore had a difficult time believing it. (*Id*.) Moore sat in the waiting room for more than 30 minutes following the visit. (*Id*. at 1510.) Moore later called and spoke to a nurse. (*Id*.) Moore was upset and said she didn't know what to do because her counselor was not available for a week and a half. (*Id*.) The nurse referred her to Mary Haven, where she could speak with someone immediately. (*Id*.) Moore seemed agreeable to going to Mary Haven and the nurse told her to call back with any further needs. (*Id*.)

On October 27, 2022, Moore had a follow up appointment with Dr. Quin. (*Id*. at 1527.) Moore complained that her elbow showed no improvement following recent dry needling. (*Id*.) Dr. Quin noted her fibromyalgia was stable on medications. (*Id*.) Dr. Quin recommended considering an injection "after one month after dry needling", a forearm brace, and warm compress. (*Id*. at 1528.)

On December 1, 2022, Moore had a follow up appointment with Dr. Quin. (*Id*. at 1525.) Moore reported her elbow had not improved after dry needling. (*Id*.) Moore elected to have an injection to treat the elbow. (*Id*. at 1526.)

On December 12, 2022, Moore had a follow up appointment with Dr. Quin. (*Id*. at 1522.) Moore reported no benefit to the injection she received the previous week, complaining that her elbow pain

11

worsened. (*Id.*) Dr. Quin noted the right elbow was tender to touch, with no evidence of induration, swelling or erythema. (*Id.* at 1523.) Dr. Quin ordered an Xray of the right elbow. (*Id.*)

On December 14, 2022, Moore followed up with Dr. Staley due to headaches. (*Id.* at 1504.) She stated her headaches were unchanged and did not want to change or add medication for headaches. (*Id.*) Dr. Staley noted that Moore was discharged from physical therapy on October 13, 2022 because Moore did not return for treatment. (*Id.*) Dr. Staley continued Moore on her current medication regimen. (*Id.* at 1506.) Dr. Staley did not discuss conversion disorder with Moore due to previous difficulty with the topic at the last appointment. (*Id.*)

On March 2, 2023, Moore followed up with Dr. Quin for her elbow pain and fibromyalgia. (*Id.* at 1520.) Moore reported increased pain in her right elbow, stating she did not have any benefit from previous injection, physical therapy, or dry needling. (*Id.*) Dr. Quin referred Moore to an orthopedic doctor due to ineffective conservative treatments. (*Id.* at 1521.)

On March 16, 2023, Moore presented to an orthopedist for elbow pain. (*Id.* at 1491.) The provider recommended conservative treatment of ice, rest, over-the-counter medication, bracing, and cortisone injections. (*Id.* at 1492.) The provider explained surgical intervention would be the next step. (*Id.*) Moore agreed to conservative treatment. (*Id.*)

**C.  State Agency Reports**

**1.  Mental Impairments**

On October 17, 2022, Cindy Matyi, Ph.D., reviewed the file and opined Moore can "comprehend and remember a variety of task instructions", "can carry out simple tasks, maintain attention, make simple decisions, and adequately adhere to a schedule." (*Id.* at 105.) Dr. Matyi opined Moore was socially avoidant and anxious around others, but could "relate adequately on a superficial basis." (*Id.* at 106.) Dr. Matyi found Moore could adapt to "routine and predictable" duties. (*Id.*)

12

### 2. Physical Impairments

On October 28, 2022, Venkatachala Sreenivas, M.D., reviewed the file and opined Moore was capable of standing and/or walking about six hours in an eight-hour workday, sitting about six hours in an eight-hour workday, occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, and other postural and manipulative limitations due to pain from fibromyalgia and tennis elbow. (*Id*. at 103-04.)

## D. Hearing Testimony

During the April 24, 2023 hearing, Moore testified to the following:

• She resides with her parents. (Tr. at 50.) They sometimes help her with chores. (*Id*.) Her mom often accompanies her when she drives out of town. (*Id*.) She is able to stay home alone and can leave the house on her own. (*Id*.) She can make herself simple meals. (*Id.* at 51.) She can meet her own personal hygiene needs for the most part. (*Id*.) She needs help carrying laundry up and down stairs. (*Id*.) She can carry groceries in the house except for bigger items. (*Id*. at 52.) She tries to visit the grocery store when it will be less busy to avoid too many people. (*Id*.) She does not have issues interacting with people in public. (*Id*.)

• She typically attends family functions like birthdays, holiday celebrations, weddings, and funerals, but sometimes does not attend due to her anxiety. (*Id*. at 66.) In terms of hobbies, she likes to read novels. (*Id*.) She is involved with her church and helps teach the children classes. (*Id*. at 67.)

• She has a driver's license and drives two to four days per week. (*Id*. at 53.) She prefers not to drive at night and prefers not to drive an hour or more by herself. (*Id*. at 54.) Her self-imposed driving limitations are due to both physical pain in her neck and arms and anxiety while driving. (*Id*.)

• She added a handrail to her front porch. (*Id*. at 55.) She uses a compression sleeve on her right arm every day. (*Id*.) She uses a heating pad on her neck and arms a few times per week. (*Id.*) She wears blue-tinted lenses in her glasses to help with light sensitivities and headaches from looking at a computer screen. (*Id*. at 69.)

• She works part-time as a clerk issuing driver's licenses and vehicle registrations. (*Id.* at 57.) She has accommodations. (*Id*.) Her boss purchased a tall chair so she does not have to stand all day. (*Id*.) She also uses an electric stapler. (*Id*.) She has at least two extra breaks per day. (*Id*.) She received help from coworkers with certain tasks, like tearing apart paper. (*Id*. at 70.) She has trouble handling small objects with her right hand. (*Id*. at 71.)

• She previously worked as an administrator for a Ugandan kid's choir, a preschool teacher, a "teaching parent" at a residential group home, and a student liaison for a Christian center. (*Id*. at 59-63.)

The VE testified Moore had past work as a driver, child monitor, clerk, preschool teacher, cleaner, and attendant. (*Id*. at 73.)  The ALJ then posed the following hypothetical question:

> [P]lease assume and [sic] individual of the Claimant's age, education, and vocational background that could perform a full range of light work but with the following limitations: frequent climbing of ramp or stairs; with no climbing of ladders, ropes, or scaffolds; frequent stooping, kneeling, and crouching; occasional crawling and occasional pushing and pulling with the bilateral upper extremities; occasional overhead reaching, bilaterally; no exposure to extreme cold, vibration or vibrating tools, unprotected heights, or moving, mechanical parts; and frequent handling and fingering bilaterally. The individual would further be limited to low-stress work which is defined as simple, routine, and repetitive task in an environment free from fast paced production such as an assembly line or conveyor belt with simple, work-related decision making, and few, if any, workplace changes; occasional contact with supervisors and incidental contact with coworkers and the general public. Incidental contact with coworkers is defined as encountering or passing in common areas such as timeclocks, breakrooms, restrooms, lunchrooms. You may even be working at the same table with others, but there would be no requirement of interaction in order to complete assigned tasks. Incidental contact with the general public is similarly defined as passing or encountering in common areas such as hallways, restrooms, or lobbies. But, again, there's no requirement of interaction in order to complete assigned tasks. Can that hypothetical individual perform any of the Claimant's past relevant work?

(*Id*. at 73-74.)

The VE testified the hypothetical individual would not be able to perform Moore's past work as driver, child monitor, clerk, preschool teacher, cleaner, or attendant. (*Id*. at 74.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as marker, inspector and hand packager, and routing clerk. (*Id*. at 74-75.)

The ALJ then asked:

> For my second hypothetical, please assume all the limitations stated in hypothetical #1, but the individual would further require a sit/stand option at the work station that would not take her off task more than 10% of the

14

> workday. Does that additional limitation erode or eliminate the jobs you
> gave in response to hypothetical #1?

(*Id*. at 75.)  The VE responded that the marker, inspector and hand packager, and routing clerk jobs would

remain, but the national number of jobs would be greatly reduced. (*Id*.) The VE testified that no other jobs

would fit that hypothetical. (*Id*.) The ALJ asked:

> And if in addition to the hypotheticals above, the individual would be absent
> one or more unscheduled full or partial days per week, or if the individual
> would be unable to regularly sustain full-time work, meaning eight hours a
> week – or I'm sorry – eight hours a day, five days a week or the equivalent
> due to needing breaks of sufficient duration to put that individual off task at
> least 25% of the workday. Such breaks would be in addition to the usual
> workday breaks, the 15 minutes in the morning and afternoon and 30
> minutes at lunch, and would be necessitated by any number of things to
> include, but not be limited to, the management of symptoms such as pain,
> fatigue, withdrawal, or social isolation, impaired focus or concentration, et
> cetera. Can that hypothetical individual perform any competitive work in
> the national economy including Claimant's past relevant work?

(*Id*. at 75-76.) The VE stated that those limitations would preclude all work. (*Id*. at 76.)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of

disability and must prove an inability to engage "in substantial gainful activity by reason of any medically

determinable physical or mental impairment," or combination of impairments, that can be expected to "result

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y*

*of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet

certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-

stage process.  20 C.F.R. §§ 404.1520(a)(4)*,* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d

504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Moore was insured on the alleged disability onset date, October 25, 2019, and remains insured through December 31, 2025, the date last insured ("DLI"). (Tr. 17.) Therefore, in order to be entitled to POD and DIB, Moore must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.

16

2.  The claimant has not engaged in substantial gainful activity since October 25, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: fibromyalgia; epicondylitis of bilateral elbows, right greater than left; anxiety; personality disorder/conversion disorder; and post-traumatic stress disorder (PTSD) (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except frequent climbing of ramps and stairs; no climbing of ladders, ropes, and scaffolds; frequent stooping, kneeling, and crouching; occasional crawling; occasional pushing/pulling with the bilateral upper extremities; occasional overhead reaching bilaterally; no exposure to extreme cold, vibration/vibrating tools, unprotected heights or moving mechanical parts; frequent handling/fingering bilaterally. The individual would further be limited to "low stress" work: simple, routine and repetitive tasks in an environment free from fast-paced production work, such as an assembly line or conveyor belt, with simple work-related decision-making and few, if any, workplace changes; occasional contact with supervisors and "incidental" contact with coworkers and the general public. ("Incidental" contact with coworkers: may encounter or pass in common areas, such as time clocks, breakrooms, restrooms, lunchrooms; may even work at the same table with other workers; no requirement of interaction with coworkers in order to successfully complete assigned tasks. "Incidental" contact with the general public: may pass or encounter in common areas, such as hallways, restrooms or lobbies, but there would be no requirement of interaction with the general public in order to successfully complete assigned tasks.)

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on September 3, 1991 and was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 25, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-32.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice"

within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.    The ALJ's Analysis.

In her first assignment of error, Moore argues the ALJ erred by "improperly discount[ing] the Plaintiff's subjective symptoms based upon a lack of objective evidence . . ." (Doc. No. 7 at 12.) Moore states the ALJ properly identified conversion disorder as a severe impairment, but failed to properly consider "whether the intensity and persistence of the Plaintiff's symptoms limit her ability to perform work-related

activities." (*Id*. at 13.)  Moore asserts the ALJ relied on Moore's abilities to perform activities of daily living and driving, but that her ability to perform these activities with help is not inconsistent with her subjective symptoms. (*Id*.) Moore contends the ALJ failed to explain the symptoms she found consistent or inconsistent with the evidence in the record. (*Id*. at 14.)

In response, the Commissioner argues the ALJ observed that Moore's medical evidence did not support the allegations as to the level of limitation alleged. (Doc. No. 9 at 9.) The Commissioner notes the ALJ considered objective medical evidence such as physical examinations, diagnostic testing, mental status exams, reported benefits of treatments, as well as Moore's activities of daily living. (*Id*. at 9-10.) The Commissioner asserts that, taken together, there was substantial evidence in support of the ALJ's symptom evaluation. (*Id*. at 10.) The Commissioner argues that the ALJ's consideration of Moore's activities of daily living was one of several considerations the ALJ weighed. (*Id*. at 11.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 404.1527(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...]

20

contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to

21

remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

A two-step process is used to evaluate an individual's symptoms. (20 CFR § 404.1529(c)(3), 416.929(c)(3); *Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (S.S.A. Oct. 25, 2017), 2017 WL 5180304.) At step one, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. (*Id*.; SSR 16-3p, 2017 WL 5180304 at *3.) At step two, the ALJ evaluates the intensity, persistence, and limiting effects of the claimant's symptoms. (*Id*. at *4.) "[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms . . . [an ALJ] must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record." (*Id*. at *5.)

Here, the ALJ expressly recognized this process when she wrote:

> In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

(Tr. 23.)

22

In the RFC analysis, the ALJ evaluated the intensity, persistence, and limiting effects of Moore's symptoms as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because despite the claimant's allegations, she remains capable of a wide variety of activities of daily living. In her function report, the claimant notes she is able to do laundry, dishes, vacuum, and sweep. She is able to prepare simple meals. She is able to drive a car, shop in stores and online, and go out alone. She is able to handle finances. She is able to run errands and, in her free time, she reads, hangs out with family, and goes to church and bible study. She stated she gets along with authority figures and has never had social problems while working in the past. (Exhibit 6E). Additionally, the claimant also testified to further being able to be left home alone and leaving the house on her own. She confirmed she is able to prepare simple meals and mostly manage her personal care needs independently. She stated she performs a variety of chores in the house, needing help largely for heavier lifting when shopping or when doing laundry. She testified that while she prefers someone go with her on longer drives out of town, she is capable of performing these jobs, but it is simply her preference not to go alone. The claimant also testified she is currently working on a part-time basis, with accommodations such as extra breaks or the ability to use a heating pad. She testified she can only sustain six hours of work, twice per week. However, the claimant's ability to sustain other activities of daily living does not support this significant limitation.
>
> The claimant's medical evidence does not support the allegations as to the level of limitation alleged. Records note a long history of treatment for concussion predating the alleged onset date. Records in June 2019 for cognitive communication, concentration, memory, and other speech disturbances noted goals were met or largely met in June 2019. (Exhibit 91F, p.183-185).

(Tr. 23-24.) The ALJ went on to discuss in detail Moore's medical evidence from 2019 through 2023, filling nearly four single spaced pages. (*Id*. at 24-27.) The ALJ included medical evidence documenting many normal findings, intact strength and sensation, normal range of motion, no swelling or edema, along with

abnormal gait and pain at touch. (*Id*. at 24-25.) The ALJ considered a brain MRI, a neck x-ray, rheumatology labs, and an EMG, none of which revealed significant problems. (*Id*.) The ALJ also considered mental status exams that sometimes documented depression and anxiety symptoms, and occasional impaired insight and judgment, but were otherwise normal. (*Id*. at 26.)

Here, proper legal standards were applied and substantial evidence supports the ALJ's findings. The ALJ expressly followed the two-step process for evaluating a claimant's symptoms. (*Id*.) At the second step, the ALJ properly considered Moore's testimony concerning her impairments, as well as diagnostic imaging and medical treatment records, and determined Moore's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id*. at 23.)

While Moore interprets the records differently, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton*, 246 F.3d at 772-73 (6th Cir. 2001). In the Sixth Circuit an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003).

It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here. While Moore would weigh the evidence differently, it is not for the Court to do so on appeal.

There is no error.

## B.    Step Five Finding

In her second assignment of error, Moore argues the ALJ improperly relied on Moore's ability to work a part-time job with accommodations when she determined that she could perform other work existing in significant numbers in the national economy. (Doc. No. 7 at 14.) Moore asserts her work is "significantly

accommodated". (*Id*. at 15.) Moore states the ALJ found her work after the alleged onset date did not constitute substantial gainful activity because it was accommodated work. (*Id*. at 16.) She argues it was improper for the ALJ to rely on Moore's ability to perform this work when the ALJ determined Moore could perform other work that exists in substantial numbers in the economy. (*Id*. at 15-16.)

In response, the Commissioner states the ALJ found at step one that Moore had not engaged in substantial gainful activity since the alleged onset date. (Doc. No. 9 at 13.) The Commissioner argues the ALJ considered Moore's activities of daily living, objective medical evidence, and her reported benefit from treatment and determined her RFC. (*Id*. at 13.) The Commissioner argues the ALJ properly relied on the VE's hearing testimony to support her step-five finding that Moore could perform work existing in significant numbers in the economy. (*Id*. at 12.) The Commissioner states the ALJ acknowledged Moore's accommodated work and also cited other evidence that resulted in her RFC finding and conclusion that Moore was capable of full-time work. (*Id*. at 13.)

"At step five of the sequential evaluation process, the burden shifts to the Commissioner to demonstrate that a claimant can perform work that is available in the national economy." *Aalijah W. v. Comm'r of Soc. Sec.*, No. 2:23-CV-1955, 2024 WL 1714484, at *7 (S.D. Ohio Apr. 22, 2024); *Rabbers v. Comm'r Soc. Sec. Admin.,* 582 F.3d 647, 652 (6th Cir. 2009). To meet this burden, "the Commissioner must make a finding 'supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002) (quoting *Varley v. Sec'y of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987)). "In so doing, typically, the ALJ poses a hypothetical question incorporating a claimant's residual functional capacity to a vocational expert, and asks how many jobs, if any, the claimant can perform." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009), citing *Webb v. Comm'r of Soc. Sec.,* 368 F.3d 629, 633 (6th Cir.2004). If the vocational expert is able to identify a significant number of jobs the hypothetical individual can perform, substantial evidence supports a finding

25

that the claimant is not disabled. *Id.*, citing *Davis v. Sec'y of Health & Human Servs.,* 915 F.2d 186, 189 (6th Cir.1990).

At her step five finding, the ALJ wrote, in part:

> If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as **marker**, DOT 209.587-034, with 60,000 jobs present nationally; **inspector/hand packager**, DOT 559.687-074, with 44,000 jobs present nationally; and as a **routing clerk**, DOT 222.687-022, with 21,000 jobs present nationally.
>
> Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles except as it relates to factors not directly addressed in the Dictionary of Occupational Titles (e.g., teamwork, proximity to others, interaction with others, etc.). The vocational expert explained that testimony regarding such factors was based on professional knowledge and experience.
>
> Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(Tr. 31-32. Emphasis original.) As discussed previously, during the hearing the ALJ asked the VE hypothetical questions concerning whether an individual with the claimant's age, education, work experience, and residual functional capacity could perform work that exists in the national economy. (Tr. 73-77.) The VE testified in the affirmative. (*Id.*) The ALJ properly relied on the VE's testimony that there were a significant number of jobs in the national economy Moore could perform. Reliance on this testimony

constitutes substantial evidence supporting the conclusion that Moore is not disabled. *See Poe,* 342 Fed. Appx. at 157.

Moore's argument that the ALJ improperly relied on Moore's ability to perform accommodated work as evidence that she could perform substantial gainful activity (Doc. No. 7 at 16) is misplaced. At step five, the ALJ considered Moore's "RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines . . ." (Tr. at 31.) The ALJ's finding that Moore's work post-alleged onset date was not substantial gainful activity because it was accommodated occurred at step two. (*Id*. at 19.) The ALJ considered Moore's part-time accommodated work, along with evidence of her activities of daily living, medical records, diagnostic tests, and response to treatment, when formulating the RFC. (*Id*. at 22-27.) As discussed above, the ALJ properly weighed the evidence to determine Moore's RFC and ultimately that she could perform jobs that exist in significant numbers in the economy. (*Id*. at 31.) Here, the ALJ applied proper legal standards, and her decision was supported by substantial evidence. *See White*, 572 F.3d at 281; *Poe,* 342 Fed. Appx. at 157.

There is no error.

## VII.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: June 17, 2025                                 *s/ Jonathan Greenberg*
                                                    Jonathan D. Greenberg
                                                    United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**